# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| BRYAN CLAYTON ENGLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:12-cv-00620 |
| v. | ) | Judge Nixon / Knowles |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff

was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended.

The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record.

Docket No. 13. Defendant has filed a Response, arguing that the decision of the Commissioner

was supported by substantial evidence and should be affirmed. Docket No. 15.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for

Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin should therefore be substituted for Commissioner Michael J. Astrue as the Defendant in this action. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

be AFFIRMED.

# I. INTRODUCTION

Plaintiff filed his applications for DIB and SSI on December 13, 2006, alleging that he had been disabled since July 27, 2003, due to mental retardation, a "bad left knee," and a "gun shot wound to left arm."[2]  Docket No. 11, Attachment ("TR"), TR 196, 199, 241.  Plaintiff's applications were denied both initially (TR 88, 90) and upon reconsideration (TR 92, 94). Plaintiff subsequently requested (TR 107) and received (TR 37-63, 64-87) a hearing.  Plaintiff's first hearing was conducted on August 28, 2009, by Administrative Law Judge ("ALJ") Linda Gail Roberts. TR 64-87.  Plaintiff and vocational expert ("VE"), Lisa Courtney, appeared and testified.  *Id.*  Plaintiff's second hearing was conducted on March 11, 2010, also by ALJ Linda Gail Roberts, at which Plaintiff and VE, Lisa Courtney, again appeared and testified. TR 37-63.

On March 24, 2010, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 17-36.  Specifically, the ALJ made the following findings of fact:

1.     Born on October 11, 1986, the claimant had not attained age 22 as of February 1, 2006 (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2.     The claimant has not engaged in substantial gainful activity since February 1, 2006 (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant's "severe" impairments have been osteochondritis dessicans of the left lower extremity, status post gunshot wound to the left upper extremity, and an adjustment disorder with mixed anxiety and depressed mood (20 CFR 404.1520(c) and 416.920(c)).

---

[2] Plaintiff protectively filed his application for SSI on November 28, 2006. TR 90.

4.    The claimant has not had an impairment or combination of impairments that has met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    Since his alleged disability onset date, the claimant could perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) expect for the limitations described in Exhibits 19F and 24F with acceptable [*sic*] of the IQ scores in Exhibit 15F.

6.    The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.    As he was born on October 11, 1986, the claimant was 16 years old, which is defined as a younger individual not younger than eighteen or older than forty-nine, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a marginal education with the ability to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.    Considering his age, education, work experience, and residual functional capacity, jobs that the claimant could perform have existed in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from July 27, 2003 through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

TR 25-30.

On May 24, 2010, Plaintiff timely filed a request for review of the hearing decision.  TR

15.  On April 16, 2012, the Appeals Council issued a letter declining to review the case (TR 1-7),

thereby rendering the decision of the ALJ the final decision of the Commissioner.   This civil

action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. § 405(g).  If the

Commissioner's findings are supported by substantial evidence, based upon the record as a

whole, then these findings are conclusive.  *Id.*

## II.  REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and

testimonial evidence of Record.  Accordingly, the Court will discuss those matters only to the

extent necessary to analyze the parties' arguments.

## III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the

administrative hearing process.  *Jones v. Sec'y, Health & Human Servs.*, 945 F.2d 1365, 1369

(6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence

exists in the record to support the Commissioner's decision, and (2) whether any legal errors

were committed in the process of reaching that decision.  *Landsaw v. Sec'y of Health & Human

Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept

as adequate to support the conclusion."  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir.

1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been

further quantified as "more than a mere scintilla of evidence, but less than a preponderance."

*Bell v. Comm'r of Soc. Sec.,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consol. Edison Co. v.*

*N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980)).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he

5

or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

>(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

>(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

>(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

>(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

>(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 CFR §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181

(6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by

relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the

---

[3] The Listing of Impairments is found at 20 CFR, Pt. 404, Subpt. P, App. 1.

claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred by failing to properly: (1) evaluate the medical opinions of record and resolve "significant" inconsistencies between the opinions and her RFC finding; (2) evaluate Plaintiff's credibility; (3) consider all of his impairments and provide sufficient reasons for not finding impairments to be "severe"; and (4) apply the Social Security Regulations and Rulings pertaining to claimants with a history of felony incarceration. Docket No. 13-1. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

The court shall have power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or
reversing the decision of the Commissioner of Social Security,
with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can
be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is
overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery
v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and
immediately award benefits if all essential factual issues have been resolved and the record
adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Sec'y of Health & Human
Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir.
1994).

## 1. Medical Opinions of Drs. George Dahir, Susan Warner, and Pilar Vargas

Plaintiff argues that the ALJ failed to properly evaluate the medical opinions of treating
physician Dr. George Dahir, medical consultant Dr. Susan Warner, and psychological consultant
Dr. Pilar Vargas. Docket No. 13-1 at 16, 18. Specifically, Plaintiff contends that the ALJ failed
to address the "significant" inconsistencies between these medical opinions and her RFC
assessment, and further failed to accord proper weight to the medical opinions of record. *Id.* at
15-16. Plaintiff argues that the ALJ's rationale for according weight to the various medical
opinions of record was "inconsistent" and "unfounded," and asserts that the ALJ should have
accorded more weight to the opinions of Drs. Dahir, Warner, and Vargas. *Id.* at 15, 20.

Regarding the opinion of treating physician Dr. Dahir, Plaintiff argues that the ALJ failed
to address Dr. Dahir's opinion that Plaintiff "is unable to work with any job that requires

walking, standing," and further failed to resolve the inconsistency between this opinion and her

RFC finding that Plaintiff is capable of "light work." *Id.* at 19 (*citing* TR 683). Plaintiff asserts

that, as his treating orthopedic surgeon, Dr. Dahir is "best suited" to render an opinion on his

ability to stand and walk, and points out that the definition of light work requires up to six hours

of standing and/or walking during an eight-hour workday. *Id.* (*referencing* SSR 83-10; 20 CFR §

404.1567).

Plaintiff further contends that the ALJ failed to provide a sufficient basis for rejecting Dr.

Dahir's opinion. *Id.* at 18. Regarding the ALJ's statement that "'Dr. Dahir's opinion that the

claimant could not work for previous five years is contradicted by his own notes, which indicate

the claimant had last aggravated his previous knee injuries by playing sports two years earlier and

by his earlier opinion in June 2007 that the claimant did not need to see him any longer,'"

Plaintiff first argues that his knee injury from playing sports actually occurred around 1997. *Id.*

(*citing* TR 29, 336). Plaintiff explains that Dr. Dahir's note from January 2010, which states,

"'patient was previously evaluated in this clinic 2 year(s) ago. This occurred month(s) ago while

playing sports,'" was an "error and/or typo in the evidence" and was referring to his initial injury

from approximately 1997. *Id.* (*citing* TR 681). In support of his argument, Plaintiff asserts that

the evidence of record shows that he injured his knee around age eleven while "sliding in to base

playing baseball," and that records from his preceding visits to Dr. Dahir note "nothing

whatsoever" about him playing sports. *Id.* (*citing* TR 336, 475-90, 525-34).

Plaintiff then argues that the ALJ erred in rejecting Dr. Dahir's opinion based on "one

single record from June 2007," in which Dr. Dahir stated that he no longer needed to see him. *Id.*

at 19 (*citing* TR 29). Plaintiff explains that he was in his third month of recovery from his last

9

knee surgery at that time, and although he was "doing much better" and had found a job, he still complained of "'quite a bit' of pain." *Id.* (*citing* TR 525). Plaintiff also notes that he: (1) "only" earned about $1,500 at the job he found around June 2007 and was "only" able to hold two other jobs for short periods of time afterwards, resulting in $1,700 at the beginning of 2008 as his last earnings; (2) continued to complain of "significant" left knee pain while incarcerated; and (3) returned to Dr. Dahir in January 2010 because of his continuing left knee pain, which is when Dr. Dahir recommended a partial knee replacement. *Id.* at 19 (*citing* TR 202, 567-679, 683). Plaintiff further notes that Dr. Dahir stated in his opinion that "Plaintiff had been unable to work due to his left knee impairments and his injury to the left arm from the gunshot wound." *Id.* (*citing* TR 683).

Regarding the opinion of state agency medical consultant Dr. Warner, Plaintiff argues that the ALJ failed to address substantial evidence supporting Dr. Warner's opinion related to Plaintiff's manipulative limitations with his left upper extremity. *Id.* at 16. Plaintiff maintains that Dr. Warner's opinion is supported by: (1) evidence from Dr. Rosenthal, which was cited by Dr. Warner, showing "decrease of grip and interossei strength on the left, decreased pin sensation to the left 1st, 2nd, and 3rd digits, and nerve conduction studies showing 'severe chronic left median neuropathy'"; (2) Plaintiff's continued complaints of pain, numbness, and weakness of the left upper extremity; and (3) records from Correct Care showing "30% atrophy with decreased strength of the left upper extremity" in May 2008. *Id.* (*citing* TR 363, 472, 639). Plaintiff further argues that, because the ALJ did not note any evidence contradicting Dr. Warner's opinion, she failed to provide any reliable basis for not according more weight to that

opinion. *Id.* (*citing* TR 29). Plaintiff asserts that the ALJ instead made a conclusory, "erroneous" statement that the limitations opined by Dr. Warner "'are not supported by the medical evidence of record.'" *Id.*

Regarding the opinion of state agency psychological consultant Dr. Vargas, Plaintiff contends that the ALJ's decision to accord more weight to the opinion of Dr. Sachs than to the opinion of Dr. Vargas was in error. *Id.* at 17-18. Specifically, Plaintiff argues that the ALJ failed to provide sufficient basis for rejecting Dr. Vargas' medical opinion, as her rationale that "'Dr. Sachs' opinion is more precise'" is unsupported by the evidence of record, which instead shows that Dr. Vargas' opinion is more precise than that of Dr. Sachs. *Id.* (*citing* TR 28-29). Plaintiff asserts that Dr. Vargas provided a more detailed narrative description of his mental limitations, and, in support of his argument, lists the limitations opined by each doctor.[4] *Id.* (*referencing* TR 496, 565). Plaintiff also maintains that Dr. Sachs' opinion is "incomplete and ambiguous, if not internally inconsistent," since Dr. Sachs failed to provide an explanation or limitations corresponding to his assessment that Plaintiff had "moderate limitations" in his abilities to: (1) complete a normal workday and workweeks without interruptions from psychologically-based

---

[4] Plaintiff notes that Dr. Sachs' narrative assessment "only stated" that Plaintiff: (1) could "'perform simple and low level detailed tasks over full workweek [*sic*]'"; (2) could "'adapt to gradual or infrequent changes'"; and (3) was "'not significantly limited'" in social interaction. Docket No. 13-1 at 17 (*citing* TR 496). Plaintiff then notes that Dr. Vargas' narrative in her Functional Capacity Assessment stated that Plaintiff: (1) "'can understand and remember simple and low level detailed instructions'"; (2) "'can concentrate and pay attention for 2 hrs given customary breaks and rests'"; (3) "'will benefit from a flexible schedule as 1-2 days/month may be missed secondary to symptomatology'"; (4) needs "'a well spaced environment with a few familiar coworkers...to reduce stress'"; (5) "'changes in the workplace should be presented infrequently and in a gradual manner'"; and (6) "'help is needed to set long term goals and plans, but claimant can manage day to day ones.'" *Id.* (*citing* TR 565).

symptoms; and (2) perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* (*citing* TR 495-96). Plaintiff further argues that, because the VE testified that Dr. Vargas' opinion would preclude work, "it is likely that the ALJ's unfounded basis for providing more weight to the opinion of Dr. Sachs was merely an excuse to eliminate Dr. Vargas' opinion, which supports a finding of disability in the Plaintiff's claim."[5] *Id.* at 17-18 (*referencing* TR 59).

Defendant responds that the ALJ properly evaluated the opinions of Drs. Dahir, Warner, and Vargas. Docket No. 15 at 14. Specifically, Defendant maintains that the ALJ provided "adequate" reasons that were supported by substantial evidence for discounting these opinions, and that Plaintiff's contentions to the contrary are meritless. *Id.* at 14, 19.

Regarding Dr. Dahir's opinion, Defendant maintains that the ALJ explained, and substantial evidence supports, her decision to discount Dr. Dahir's opinion because it was inconsistent with other evidence, including his own treatment notes. *Id.* at 18 (*citing* TR 29). In particular, Defendant points out that, although Dr. Dahir opined in a January 2010 treatment note that Plaintiff had been unable to work for the past five years, his medical records show that: (1) he stated in the same note that Plaintiff had re-injured his left knee while playing sports "'month(s) ago'"; and (2) Plaintiff told him in January 2007 that he was working, at which point the doctor opined that Plaintiff's left-knee impairment no longer required treatment. *Id.* (*citing* TR 29, 525, 681, 683). Defendant further asserts that the ALJ's decision demonstrates that Dr.

---

[5] Specifically, Plaintiff notes that the VE stated, "'26F changes the picture somewhat, because they would have to miss one to two days per month. Now, over time, I think they would lose their job.'" Docket No. 13-1 at 17 (*citing* TR 59).

Dahir's opinion was inconsistent with the opinions of Dr. Warner and Dr. Gregory that Plaintiff was not disabled and could perform a range of light work. *Id.* (*citing* TR 29, 465-72, 541-48). Addressing Plaintiff's argument that Dr. Dahir made an "'error and/or typo'" in stating that Plaintiff had exacerbated his knee injury by playing sports "'month(s) ago,'" Defendant contends that nothing in the record suggests that Dr. Dahir "misstated his opinion." *Id.* (*citing* Pl.'s Br. 18). Defendant argues therefore that the ALJ properly discounted Dr. Dahir's opinion. *Id.*

Regarding Dr. Warner's opinion, Defendant argues that the ALJ was not required to "explicitly discuss" that opinion because Dr. Warner was not a treating source. *Id.* at 16. Defendant explains that Dr. Warner never examined Plaintiff, but instead based her opinion on her review of an "incomplete version" of the record in February 2007. *Id.* (*citing* TR 472). Defendant maintains that, nonetheless, the ALJ explained, and substantial evidence supports, her decision to accord less weight to Dr. Warner's opinion than to Dr. Gregory's opinion because the manipulative limitations assessed by Dr. Warner were unsupported by the evidence of record. *Id.* (*citing* TR 29). In particular, Defendant points out that: (1) Dr. Rosenthal advised Plaintiff against surgery on his left hand in March 2005 "in part" because nerve conduction studies from February 2005 showed "'spontaneous improvement'"; (2) no evidence after March 2005 shows that Plaintiff told any health care provider of continued problems with his hand, or that he received any further treatment for his hand; and (3) Dr. Gregory, after reviewing a "more complete" version of the record than Dr. Warner, opined in September 2007 that Plaintiff had no manipulative limitations. *Id.* (*citing* TR 364, 544). Defendant further argues that Plaintiff's contention regarding Dr. Warner's opinion "misreads the record," as physicians in May 2008 did

not report manipulative limitations of Plaintiff's left hand, but rather reported "some loss of strength" in Plaintiff's left arm and shoulder. *Id.* at 16-17 (*citing* TR 639). Defendant maintains therefore that the ALJ properly discounted Dr. Warner's opinion. *Id.* at 16.

Regarding Dr. Vargas' opinion, Defendant similarly argues that the ALJ was not required to discuss her evaluation of it because, like Dr. Warner, Dr. Vargas never treated or examined Plaintiff. *Id.* at 17 (*citing* TR 494-97, 504-17, 549-66). Defendant maintains that, even so, the ALJ explained that she discounted Dr. Vargas' opinion because Dr. Sachs' opinion was more precise, and substantial evidence supports her finding. *Id.* (*citing* TR 28). Specifically, Defendant asserts that, whereas Dr. Sachs provided "much greater specificity" for his conclusions, Dr. Vargas did not provide an explanation for her "vague" opinion that Plaintiff needed a "'well spaced environment'" and "'a few familiar coworkers.'" *Id.* (*citing* TR 29, 496, 516, 565). Defendant further contends that, although Plaintiff correctly notes that Dr. Vargas and Dr. Sachs offered a "similar degree of detail" regarding their opinions in their respective Mental RFC Assessment forms, Dr. Sachs provided "significantly greater specificity" than Dr. Vargas in his Psychiatric Review Technique form.[6] *Id.* (*citing* TR 496, 516, 561, 565). Defendant thus argues that the ALJ properly accorded more weight to Dr. Sachs' opinion that to that of Dr. Vargas. *Id.*

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

---

[6] Defendant's brief states, "...Dr. Vargas provided significantly greater specificity than Dr. Sachs in his Psychiatric Review Technique form." Docket No. 15 at 17. Defendant appears to have made a typographical error by switching the names of the doctors, and the Court will construe it as such.

Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. . . .

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. . . .

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

. . .

20 CFR § 416.927(c) (emphasis added). *See also* 20 CFR § 404.1527(c).

The ALJ must articulate the reasons underlying her decision to give a medical opinion a specific amount of weight.[7]  *See, e.g.,* 20 CFR § 404.1527(d); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646 (6th Cir. 2009); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  The reasons must be supported by the evidence and must be sufficiently specific so as to make clear to any subsequent reviewers the weight the ALJ gave to the treating source medical opinion and the reasons for that weight.  SSR 96-2p.

The Sixth Circuit has held that, "provided that they are based on sufficient medical data, the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (*quoting Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)).  If the ALJ rejects the opinion of a treating source, she is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 CFR § 404.1502.

---

[7] There are circumstances when an ALJ's failure to articulate good reasons for the weight accorded to medical opinions may constitute harmless error: (1) if a treating source opinion is so patently deficient that the ALJ could not possibly credit it; (2) if the ALJ adopts the opinion or makes findings consistent with the opinion; and/or (3) if the ALJ has complied with the goal of 20 CFR § 1527(d), by analyzing the physician's contradictory opinions or by analyzing other opinions of record.  *See, e.g., Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. April 28, 2010); *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-72 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2006).

Regarding the opinions of State agency medical or psychological consultants, SSR 96-6p states:

> . . . RFC assessments by State agency medical or psychological consultants or other program physicians or psychologists are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s). Again, they are to be evaluated considering all of the factors set out in the regulations for considering opinion evidence.

SSR 96-6p.

The ALJ is not bound by findings made by State agency medical and psychological consultants. 20 CFR § 404.1527(e)(2)(i). Unless a treating source's opinion is given controlling weight, the ALJ must explain the weight accorded to the opinions of State agency medical and psychological consultants, as is required for all medical opinions of record. 20 CFR § 404.1527(e)(2)(ii). The opinion of a non-examining physician is due less deference than the opinion of a treating physician and may be rejected if not supported by objective medical evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

On January 13, 2010, Plaintiff's treating physician, Dr. George Dahir, stated in a treatment note:

> Patient with severe pain secondary to OA after OCD. Has had osteotomy with little relief of pain. Unable to work for past 5 years. Seeking disability. Also has had GSW to left arm. I feel patient is unable to work with any job that requires walking, standing. Needs partial knee replacement. Will attempt to get Americhoice/Tn Care.

TR 683.

As noted above, a treating physician's opinion is accorded greater weight than other

17

opinions when that opinion is supported by medically acceptable clinical and laboratory

diagnostic techniques, and is consistent with the evidence of record.  In the instant action,

however, the ALJ found that Dr. Dahir's opinion contradicted other evidence in the record and

was therefore entitled to less weight.  TR 29.  Specifically, the ALJ discussed Dr. Dahir's

treatment records, treatment note, and the weight accorded thereto as follows:

> In December 2006, George Dahir, M.D., an orthopedic surgeon,
> diagnosed the claimant with plica (irritation caused by remnant of
> fetal tissue), osteoarthritis, and osteochrondritis dessicans (necrosis
> of subchondral bone sometimes referred to as OCD) of the left
> knee.  Dr. Dahir then performed an arthroscopic partial
> synovectomy.  Exhibit 13F.
>
> . . .
>
> In early March 2007, Dr. Dahir diagnosed the claimant with an
> osteochondritis dessicans lesion of the medial femoral condyle and
> osteoarthritis.  He then performed an osteoarticular transfer system
> (OATS) procedure to the lesion along with a high tibial osteotomy.
> Afterward, he prescribed crutches.  Exhibit 17F.
>
> A week later, the claimant went to the ER because he had run out
> of his pain medication.  He estimated his pain level was a nine on
> an increasing scale from one to ten.  At Dr. Dahir's request, the
> claimant underwent an ultrasound of the left lower extremity,
> which was negative.  Exhibit 18F.
>
> In late May 2007, the claimant told Dr. Dahir he had been doing
> fairly well until he fell into a pothole a week earlier.  Still, Dr.
> Dahir noted the claimant had gone to the ER and has been
> diagnosed with a probable ligament tear.  Dr. Dahir found he had
> pain in the hamstrings and pain with extension of the left knee.  He
> also found the claimant was using crutches but could walk without
> them albeit slowly.  Dr. Dahir ordered X-rays of the knee, which
> revealed a healed osteotomy site.  He prescribed physical therapy
> "to get the claimant off the crutches as soon as possible."  Exhibit
> 23F, p. 2.
>
> A month later, the claimant reported pain in the knee to Dr. Dahir,

but also said he had completed physical therapy and had stopped using the crutches. The claimant also said he had "weaned himself off the pain medication and ha[d] found a job." Dr. Dahir stated the claimant was doing much better and told him he did not need to see him any longer. Exhibit 23F, p. 1.

No evidence was submitted that the claimant returned to see Dr. Dahir before his incarceration in April 2008.

. . .

In January 2010, the claimant returned to see Dr. Dahir and complained about left knee pain but denied taking any medications. Dr. Dahir noted he had seen the claimant two earlier [*sic*] after he repaired a knee injury sustained while the claimant was "playing sports." He found tenderness in the knee but normal to nearly normal ranges of motion. Dr. Dahir diagnosed knee arthritis and wanted to order X-rays of the knee; he also scheduled a partial knee replacement for a month later. Dr. Dahir opined the claimant was "unable to work for [previous five] years." He also opined the claimant was "unable to work with any job that requires walking [or] standing." Exhibit 30F.

No evidence was submitted that the claimant underwent that procedure.

. . .

Regarding the claimant's physical capabilities, Dr. Dahir's opinion that the claimant could not work for the previous five years is contradicted by his own notes, which indicate the claimant had last aggravated his previous knee injuries by playing sports two years earlier and by his earlier opinion in June 2007 that the claimant did not need to see him any longer. . . .

TR 22-24, 29 (*citing* TR 448-51, 473-78, 479-93, 525, 526, 680-83).

As can be seen, the ALJ specifically discussed Dr. Dahir's opinion, articulated the weight

accorded to that opinion, and explained her rationale for the weight she accorded thereto.

Contrary to Plaintiff's assertion that the ALJ failed to address Dr. Dahir's opinion that Plaintiff

"is unable to work with any job that requires any walking [or] standing," the ALJ was aware of, and explicitly acknowledged, this opinion in her decision.

Dr. Dahir treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's according greater weight to his opinion than to other opinions, as long as that opinion was supported by medically acceptable clinical and laboratory diagnostic techniques, and consistent with the evidence of record. As can be seen in the ALJ's discussion quoted above, however, Dr. Dahir's opinion contradicted his own treatment notes. Furthermore, as will be discussed in greater detail below, Dr. Dahir's opinion was inconsistent with other medical opinions of record.

As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 CFR § 416.927(d)(2) and 20 CFR § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* When the opinions are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 CFR § 416.927(e)(2). As such, the Regulations do not mandate that the ALJ accord Dr. Dahir's evaluation controlling weight. Accordingly, Plaintiff's argument on this point fails.

On February 27, 2007, Stage agency medical consultant Dr. Susan Warner completed a Physical RFC Assessment regarding Plaintiff. TR 465-72. The ALJ discussed this Assessment as follows:

> In February 2007, after reviewing the claimant's medical records, Susan Warner, M.D., a state agency medical consultant, diagnosed status post left knee arthroscopy and a left upper extremity (LUE) median nerve injury. Dr. Warner opined that, during an eight-hour

workday, he could lift and/or carry 20 pounds occasionally and 10
pounds frequently, could stand and/or walk for 6 hours, could sit
for 6 hours, could frequently push and/or pull with the left upper
extremity (LUE), and could perform frequent postural activities
(except for occasionally climbing ladders, ropes, or scaffolds) with
no other limitations. Exhibit 16F.

TR 22 (*citing* TR 465-472).

The ALJ also discussed the Physical RFC Assessment completed by fellow State agency

medical consultant Dr. James Gregory on September 24, 2007, as follows:

In September 2007, after reviewing the claimant's medical records,
James Gregory, M.D., a state agency medical consultant, diagnosed
a left knee disorder and status post gunshot wound (GSW) to the
left arm. Dr. Gregory concurred with Dr. Warner's opinion
regarding the claimant's physical capabilities except he did <u>not</u>
believe the claimant was limited in his ability to push or pull.
Exhibit 24F.

TR 23 (*citing* TR 541-48).

After evaluating all of the evidence of record regarding Plaintiff's physical impairments,

including that from Dr. Dahir, the ALJ discussed the weight accorded to the opinions of Dr.

Warner and Dr. Gregory as follows:

. . .The remaining opinions from Drs. Gregory and Warner are
rather consistent. Still, Dr. Warner provided allowances for
manipulative limitations with the left upper extremity, while Dr.
Gregory did not. Those limitations, however, are <u>not</u> supported by
the medical evidence of record. Hence, Dr. Gregory's opinion
receives more weight than that of Dr. Warner.

TR 29 (underlining original).

As noted, the ALJ is not bound by findings made by State agency medical consultants. In

the case at bar, the ALJ found that part of Dr. Warner's opinion was inconsistent with the

evidence of record and therefore entitled to less weight than the opinion of Dr. Gregory. As can

be seen above, the ALJ specifically discussed Dr. Warner's opinion, articulated the weight accorded to that opinion, and explained her rationale for the weight she accorded thereto. The Regulations do not require more. Accordingly, Plaintiff's argument regarding the ALJ's consideration of Dr. Warner's opinion fails.

On October 11, 2007, Dr. Pilar Vargas completed a Psychiatric Review Technique form and a Mental RFC Assessment regarding Plaintiff. TR 549-62, 563-66. The ALJ discussed the medical opinions of record regarding Plaintiff's mental impairments, including that of Dr. Vargas, as follows:

> In February 2007, at the request of the Social Security Administration, Arthur Stair, M.A., a psychological examiner, interviewed the claimant and administered psychological and intelligence tests. The claimant reported "being depressed sometimes"; he also said his knee pain "ke[pt him] from doing things that [he] used to be able to do." The claimant stated he had been sexually abused as a child and had difficulty getting along with others. He reported being in special education classes throughout school until he dropped out in the twelfth grade. The claimant added he was suspended from school because of behavior problems. He said he had had difficulties working because of "nerve damage in [his] left arm" and had last worked in 2006. The claimant said he lived with his grandmother, and his activities included watching television, playing video games and doing simple chores. Mr. Stair noted the claimant had mild to moderate symptoms of situational anxiety and depression; he estimated the claimant's cognitive abilities were in the low average range. Mr. Stair found the claimant had slightly below average abilities to think abstractly and perform logic-based problems but could maintain a logical and coherent train of thought. Mr. Stair also found the claimant had a fair level of executive thinking and a fair attention span, but the rest of his mental status examination was unremarkable. Based upon the results of the Wechsler Adult Intelligence Scale-III (WAIS-III), Mr. Stair estimated that the claimant had a Verbal IQ of 80, a Performance IQ of 84, and a Full Scale IQ of 80. Based upon the results of a Wide Range Achievement Test (WRAT), he estimated that the claimant could read and spell at a sixth grade

level and do arithmetic at a fourth grade level. Mr. Stair diagnosed a chronic mild to moderate adjustment disorder with mixed anxiety and depressed mood and assigned a Global Assessment of Function (GAF) score of 60, which indicated moderate, almost mild, serious symptoms. He opined

> [t]he claimant appears to be fully capable of understanding simple information or directions with the ability to put it to full use in a vocational setting. The claimant's ability to comprehend and implement multi-step complex instructions is likely to range from marginal to adequate, depending on the complexity of the task, due to claimant's low-average IQ. The claimant's ability to maintain persistence and concentration on tasks for a full work day and work week is mildly impaired given the claimant's adjustment disorder with mixed anxiety and depressed mood. The claimant's social relationships do not appear to be significantly impaired at the present time.

Charlton Stanley, Ph.D., a psychologist, also signed Mr. Stair's report. Exhibit 15F.

A month later, after reviewing the claimant's medical records, Edward Sachs, Ph.D., a state agency psychological consultant, concurred with Mr. Stair's diagnosis. Dr. Sachs opined that the claimant could understand and remember simple and low level detailed tasks over a full work week and could adapt to gradual or infrequent change with no significant limitations in social interaction. Exhibit 19F and 21F.

In October 2007, after reviewing the claimant's medical record, Pilar Vargas, M.D., another state agency psychological consultant also concurred with Mr. Stair's diagnosis. Dr. Vargas opined the claimant could understand, remember, and carry out simple and low level detailed instructions; could concentrate and pay attention for two hours at a time, might miss one to [*sic*] days of work a month, would need a well-spaced environment with a few familiar co-workers to reduce stress, could adapt to infrequent and gradual change, and would need help with long-term, but not short-term, goals. She also opined the claimant had no significant problems with social interaction. Exhibits 25F and 26F.

TR 24-25 (*citing* TR 457-64, 494-97, 504-17, 549-62, 563-66).

After evaluating all of the evidence of record regarding Plaintiff's mental impairments, the ALJ discussed the weight accorded to the opinions of Drs. Vargas, Stair, and Sachs as follows:

> As for the opinion evidence, Mr. Stair examined the claimant and administered intelligence tests, while the state agency psychological consultants reviewed the claimant's medical records. Also, the assessments of Drs. Sachs and Vargas are much more specific than that of Mr. Stair, who is <u>not</u> a psychologist. Hence, the opinions of Sachs and Vargas receive more weight than that of Mr. Stair. Between the two, however, Dr. Sachs' opinion is more precise, as evidenced by Dr. Vargas' restriction regarding "a well-spaced environment." Thus Dr. Sachs' opinion receives the most weight.

TR 28-29.

As noted above, the ALJ is not bound by findings made by State agency psychological consultants. In the instant action, the ALJ accorded more weight to the opinions of Dr. Vargas and Dr. Sachs than to the opinion of Dr. Stair, and between the opinions of Drs. Vargas and Sachs, found that Dr. Vargas' opinion was less precise than that of Dr. Sachs, and was therefore entitled to less weight. As can be seen above, the ALJ specifically discussed Dr. Vargas' opinion, articulated the weight accorded to that opinion, and explained her rationale for the weight she accorded thereto. Furthermore, the ALJ directly cited to evidence in support of her rationale. The Regulations do not require more. Accordingly, Plaintiff's argument regarding the opinion of Dr. Vargas also fails.

## 2. Credibility of Plaintiff's Statements

Plaintiff contends that the ALJ failed to properly assess the credibility of his statements as required by SSR 96-7p. Docket No. 13-1 at 20. In particular, Plaintiff maintains that the ALJ

committed "material error" by failing to: (1) specify the weight accorded to Plaintiff's hearing testimony and complaints of record; (2) consider significant evidence in her credibility analysis; and (3) provide a reasonable basis for discrediting Plaintiff's statements regarding his limitations in sitting, standing, and using his left upper extremity. *Id.* at 20, 22. Accordingly, Plaintiff argues that the ALJ's credibility analysis lacks the support of substantial evidence and cannot stand. *Id.* at 22.

Plaintiff first contends that, in discrediting his statements regarding his ability to stand and walk, the ALJ "merely mentioned" one treatment note from Dr. Dahir in June 2007 and failed to note the more recent evidence in support of Plaintiff's allegations – specifically, Dr. Dahir's recommendation in January 2010 that Plaintiff undergo a partial knee replacement. *Id.* at 21 (*citing* TR 28, 683). Next, responding to the ALJ's statement that Plaintiff "'testified he could not use his left arm, yet, according to his Function Report-Adult, he is right-handed,'" Plaintiff argues that his right-handedness has "absolutely no bearing" on his ability to use his "severely impaired" left upper extremity. *Id.* at 21 (*citing* TR 28).

As to the ALJ's statement that Plaintiff "'testified he lived with his mother, who was disabled, and his grandmother, who received Social Security benefits; it would seem they would have limited abilities to perform the household chores,'" Plaintiff asserts that the statement is an "unfounded presumption" and contradicts evidence showing that Plaintiff's mother is on disability for a mental impairment which would not "necessarily" affect her ability to perform household chores. *Id.* at 21-22 (*citing* TR 28, 340). Finally, in response to the ALJ's statement that Plaintiff "'in March 2009 insisted his seizure disorder was really a misdiagnosed anxiety disorder,'" Plaintiff argues that he "may very well have believed" he had a seizure disorder until

then, but, in any event: (1) it has "no bearing" on his ability to stand, walk, or use his left upper extremity; and (2) the limitations at issue are related to "medically determinable impairments with objective evidence in the record confirming their severity." *Id.* at 22 (*citing* TR 28, 363, 449, 475, 480, 639, 683).

Defendant responds that the ALJ properly evaluated Plaintiff's credibility and "determined that [his] complaints of disabling symptoms were not fully credible." Docket No. 15 at 11. Defendant maintains that the ALJ provided specific reasons for her decision, and that these reasons are supported by substantial evidence. *Id.* at 12. Defendant explains that the ALJ "found that [Plaintiff's] testimony about the limitations resulting from his left-arm impairment was inconsistent with the medical evidence." *Id.* at 11 (*citing* TR 28). Defendant points out that, although Plaintiff testified that his left-arm impairment prevented him from "'holding anything,'" the record shows: (1) no medical evidence that the impairment imposed "such extreme limitations"; (2) Plaintiff rarely reported left-arm symptoms to his treating physicians; (3) Dr. Warner opined in February 2007 that Plaintiff's left-arm impairment was "not disabling" and that he could perform light work; and (4) Dr. Gregory, in agreement with Dr. Warner, opined in September 2007 that Plaintiff could perform light work. *Id.* (*citing* TR 45, 465-72, 541-48).

Defendant also maintains that the ALJ pointed out in her decision numerous inconsistencies between Plaintiff's complaints and the record, including that: (1) Plaintiff's allegations of disabling standing and walking limitations were inconsistent with Dr. Dahir's medical opinion, which noted in June 2007 that Plaintiff "was working and that his left knee would not require further treatment unless it worsened"; and (2) Plaintiff's testimony that "he was 'on' three different medications for his mental impairments" was inconsistent with his report

to Dr. Dahir in January 2010 that he was not taking any medication.  *Id.* at 11-12 (*citing* TR 28-29, 50, 525, 681).  Defendant further maintains that the ALJ "found that [Plaintiff] made inconsistent statements regarding his alleged seizure disorder."  *Id.* at 12 (*citing* TR 28).  Specifically, Defendant points out that, although Plaintiff reported seizures on a "relatively frequent basis" before and during his incarceration, his: (1) treatment notes "suggest that he did so at least partly for non-medical reasons, i.e., he wished to avoid stressful situations at home or in prison"; and (2) medical records show that he told doctors in May 2009, near the end of his sentence, that his seizure disorder was "'really' just 'a little anxiety.'" *Id.* (*citing* TR 28, 351, 618, 676).

Defendant additionally argues that Plaintiff's contentions lack merit.  *Id.* at 10.  Defendant maintains that, even though the ALJ did not explicitly state the weight she accorded to his statements, the omission does not require remand because courts in the Sixth Circuit have "regularly upheld" ALJ decisions of this nature, as long as the decision otherwise provides specific reasons, supported by the evidence, for discounting the claimant's testimony.  *Id.* at 12.  Defendant further asserts that: (1) Plaintiff's contention regarding his left-knee impairment ignores his disability allegations, as medical evidence showing that he was not disabled in June 2007 is "clearly" inconsistent with his allegation that he was disabled from July 2003 up to the date of the hearing; and (2) Plaintiff's contention regarding his alleged seizure disorder is contradicted by the record, which shows that he understood his alleged seizure disorder was "something far less serious, i.e., that it was 'really' just 'a little anxiety.'" *Id.* at 13 (*citing* TR 676).

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's subjective

allegations:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (emphasis added); *see also* 20 CFR §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 (6th Cir. 1990) ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other.").  Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity."  *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain.  *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 CFR § 404.1529(c)(2)).  After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an

ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981).

In the instant case, the ALJ discussed Plaintiff's testimony, including his subjective complaints, as follows:

> At the first hearing, the claimant testified about his vocational and medical histories. He said he had completed the eleventh grade before leaving school. The claimant stated he had had special education classes in all grades. He said he lived with his mother and grandmother. The claimant did not testify about his limitations to any significant extent. . . .
>
> At the second hearing, the claimant reiterated what he said at the first hearing. He stated he had nerve damage in his left arm and could not feel anything or open anything. The claimant said he had three knee surgeries with the first in 2005 after he sustained a "cracked femur" while playing baseball; he stated he had to have rods and screws in his legs. The claimant could not remember the second surgery but said the third one required a metal plate in 2006. He stated he could not work an eight-hour day because he would "fall apart" because of his leg and arm. The claimant estimated he could not sit or stand for more than fifteen to twenty minutes at a time and had to extend his leg after standing. He estimated he could only walk ten to fifteen feet before having to "recuperate" for five to ten minutes. The claimant stated he had barely any movement in his left arm and could not lift anything. He said pain kept him from sleeping. The claimant said he had symptoms of depression and "they [had him] on" on [*sic*] three medications. The claimant said he had previously taken medications for attention deficit disorder but did not any longer. He said he still had difficulty concentrating; when asked to give an example, he said he did "not know how to put it." The claimant then [*sic*] he could not finish a newspaper article because he could not "comprehend what [he] was reading." He said he had often [*sic*] difficulty expressing himself. The claimant said Dr. Dahir performed all surgeries on left knee. He acknowledged Dr. Dahir recommended a knee replacement but he could not get one. The

claimant added his mother who was disabledand his grandmother
receives Social Security benefits [*sic*].

TR 28 (*referencing* TR 41-55, 67-74).

The ALJ ultimately found that Plaintiff's subjective complaints were not fully credible, as

they were inconsistent with other evidence of record. *Id.* Specifically, the ALJ articulated:

> The claimant testified he could not feel anything or open anything
> with his left arm, yet that statement is not supported by the
> objective evidence. The claimant testified he could not walk more
> than ten to fifteen feet or stand more than twenty minutes, yet, in
> June 2007, Dr. Dahir found he was doing much better and did not
> need to see him any longer. The claimant testified "they [had him]
> on" three antidepressant medications, yet, when he saw Dr. Dahir
> in January 2010, he denied being on any medications. The
> claimant testified he could not use his left arm, yet, according to
> his Function Report-Adult, he is right-handed. The claimant
> testified he lived with his mother, who was disabled, and his
> grandmother, who received Social Security benefits; it would seem
> they would have limited abilities to perform the household chores.
> Moreover, the claimant told Mr. Stair in January 2007 he
> performed "simple chores." Finally, the records from the
> claimant's incarceration do <u>not</u> support his subjective complaints.
> Perhaps most importantly, after initially asserting he had a seizure
> disorder and maintaining that assertion for many months, the
> claimant in March 2009 insisted his seizure disorder was really a
> misdiagnosed anxiety disorder.

TR 28 (*referencing* TR 41-55, 67-74, 252, 457-64, 525, 655-79, 681) (emphasis in original).

As can be seen, the ALJ's decision specifically addresses Plaintiff's testimony, daily

activities, and subjective claims, indicating that these factors were considered. TR 28.

Additionally, as demonstrated in the previous statement of error, the ALJ considered and

discussed the medical and opinion evidence of record. Contrary to Plaintiff's argument that the

ALJ failed to note Dr. Dahir's recommendation that Plaintiff undergo a partial knee replacement,

the ALJ specifically addressed this recommendation, as quoted in the first statement of error. TR

23. Furthermore, the ALJ went on to specifically note that there was no evidence showing that Plaintiff underwent that procedure. TR 24.

While Plaintiff is correct that the ALJ did not explicitly state the weight accorded to Plaintiff's hearing testimony and subjective complaints, this does not warrant reversal because: (1) the ALJ's statements are sufficiently specific to make clear that little weight was accorded; and (2) the Sixth Circuit has explicitly stated that "harmless error analysis applies to credibility determinations in the social security disability context." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012); *see also* SSR 96-7p.

As has been demonstrated here and in the other statements of error, the ALJ considered the record in its entirety, including the medical and testimonial evidence. It is clear from the ALJ's articulated rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on evidence inconsistent with Plaintiff's allegations. This is within the ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; *Kirk,* 667 F.2d at 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 862 F.2d at 1227; *cf*

*King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record. S*ee King*, 742 F.2d at 975.

After assessing all the objective medical evidence, the ALJ determined that Plaintiff's testimony regarding his subjective complaints was not fully credibly, as it was inconsistent with objective evidence of record. TR 28. The ALJ observed Plaintiff during his two hearings, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

**3. Consideration of Plaintiff's "Severe" Impairments, and Inclusion in the RFC**

Plaintiff argues that the ALJ failed to properly consider all of his severe impairments. Docket No. 13-1 at 12. Specifically, Plaintiff contends that the ALJ failed to: (1) properly consider his "osteoarthritis of the left knee" and "neuropraxia of the left upper extremity"; (2) provide sufficient reasons for not finding these impairments to be "severe"; and (3) include appropriate limitations resulting from these impairments in her RFC determination. *Id.* at 12-13, 15. Plaintiff asserts that he has been diagnosed with the impairments noted above, that his diagnoses are well-documented in the record, and that these impairments "cause more than a minimal effect on [his] ability to function," such that the ALJ should have found them to be "severe." *Id.* at 12-14.

Regarding Plaintiff's osteoarthritis of the left knee, Plaintiff argues that the ALJ

erroneously determined that his osteoarthritis did not meet the duration requirement for "severe" impairments, when, in reference to Dr. Dahir's recommendation of a partial knee replacement in January 2010, the ALJ explained "'it remains  to be seen whether the condition will persist or whether the claimant will undergo successful treatment within twelve months of when he saw Dr. Dahir.'"  *Id.* at 13 (*citing* TR 26).  Plaintiff argues that his osteoarthritis was well-established before he saw Dr. Dahir.  *Id.* Plaintiff points out that both his December 2006 and March 2007 knee surgical records show pre- and postoperative diagnoses including osteoarthritis, and further notes that the evidence shows his persistent complaints of left knee pain beginning in 2003.  *Id.* (*citing* TR 449, 475).

As to Plaintiff's "neuropraxia and/or severe chronic left median neuropathy," Plaintiff argues that the ALJ failed to discuss the evidence in the record pertaining to these impairment(s).  *Id.* at 14.  Plaintiff notes that the record reflects his "continued complaints of pain, numbness, and weakness with atrophy of the left upper extremity," and Plaintiff further asserts that objective electrodiagnostic testing confirmed his "neuropraxia and/or severe chronic left median neuropathy."  *Id.* (*referencing* TR 352-66, 400-37, 567-679).  Plaintiff maintains that this evidence gives "substantial evidentiary support" to Dr. Warner's opined manipulative limitations regarding Plaintiff's left upper extremity.  *Id.*

Plaintiff additionally contends that the ALJ erred by finding Plaintiff's "status post gunshot wound to the left upper extremity" to be a severe impairment, but failing to include in her RFC determination any related limitations.  *Id.* (*citing* TR 26-27).  Plaintiff argues that the ALJ's finding of severity "necessarily" means that his status post gunshot wound to the left upper extremity results in work-related functional limitations.  *Id.*

Defendant responds that the ALJ properly determined that Plaintiff's "left-knee osteoarthritis" and "left-hand neuropathy" were not severe impairments, and that her findings are supported by substantial evidence. Docket No. 15 at 19. Regarding Plaintiff's left-knee osteoarthritis, Defendant points out that: (1) Plaintiff's left-knee impairment was more consistently described as "'osteochondritis'"; (2) no evidence shows that Plaintiff continued to complain of or seek any treatment for his osteoarthritis after January 2010; and (3) the record shows that Plaintiff complained of left knee pain "infrequently" from 2003 to 2010, typically as a result of a recent accident (e.g. jumping out of a moving car, falling into a pothole, or slipping on ice) with symptoms eventually subsiding. *Id.* at 19-21 (*citing* TR 368, 438, 472, 475-76, 519, 530, 531, 537, 538, 540, 548). Defendant further argues that, regardless of the "medical jargon" used, the ALJ accounted for all of the limitations imposed by Plaintiff's left-knee impairment. *Id.*

Regarding Plaintiff's left-hand neuropathy, Defendant argues that, although Plaintiff's left-hand function was "somewhat impaired" immediately following the gunshot injury to his left arm, the record shows that his left-hand function improved and was not "significantly impaired" by the time of the ALJ's decision. *Id.* at 21. Specifically, Defendant points out that: (1) while Dr. Rosenthal's findings showed "some residual impairment" of Plaintiff's left hand in March 2005, they also showed "'spontaneous improvement'"; (2) no evidence shows that Plaintiff complained of any impairment of the hand after his examination with Dr. Rosenthal in March 2005; and (3) subsequent physical examinations of Plaintiff's extremities did not show any problems with his hand, but instead affirmatively showed that his hands had "normal" motor and sensory function. *Id.* at 21-22 (*citing* TR 363-64, 401-06, 682).

At step two of the sequential evaluation process, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 CFR § 404.1520(c). An impairment or combination of impairments is "severe" within the meaning of the Regulations if it significantly limits a claimant's physical or mental ability to perform basic work activities; conversely, an impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. *Id.*; 20 CFR §§ 404.1521(a), 416.920(c), 416.921(a). The Sixth Circuit has described the severity determination as "a de minimis hurdle" in the disability determination process, the goal of which is to screen out groundless claims. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). Where the ALJ finds that the claimant has at least one severe impairment and proceeds to complete the sequential evaluation process, however, the ALJ's failure to find that another condition is a severe impairment cannot constitute reversible error. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

The ALJ in the instant action found that Plaintiff has the following severe impairments: osteochondritis dessicans of the left lower extremity, status post gunshot wound to the left upper extremity, and an adjustment disorder with mixed anxiety and depressed mood. TR 25. Because the ALJ specifically found that Plaintiff had at least one severe impairment and completed the sequential evaluation process, the ALJ's alleged failure to find Plaintiff's "osteoarthritis of the left knee" and "neuropraxia of the left upper extremity" "severe" cannot constitute grounds for reversal. *See Maziarz*, 837 F.2d at 244. Moreover, the ALJ's decision demonstrates that she was aware of, and considered, Plaintiff's osteoarthritis and "left upper extremity (LUE) median nerve

injury," as she referenced these impairments in her decision.  TR 22-23, 26.  Accordingly, Plaintiff cannot prevail on this ground.

Regarding Plaintiff's argument that the ALJ erred when she found Plaintiff's "status post gunshot wound to the left upper extremity" "severe" at step two, but failed to include any limitations resulting from it in her RFC finding, as discussed above, a step two finding of severity is a "de minimis hurdle" in the disability determination process, the goal of which is to screen out groundless claims.  *Higgs*, 880 F.2d at 862; *Farris,* 773 F.2d at 89.  An impairment or combination of impairments is "severe" within the meaning of the Regulations at step two if it significantly limits a claimant's physical or mental ability to perform basic work activities.  20 CFR § 404.1520(c).  *See also* SSR 96-3p.  The "significant" limitation standard is liberally construed in favor of the claimant. *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007).

In contrast, determining a claimant's limitations for purposes of establishing an RFC occurs in steps four and five of the sequential evaluation process and requires consideration of the combined effect of a claimant's impairments: mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B); 20 CFR §§ 404.1520, 404.1545, 416.920.  A claimant's RFC is defined as the "*maximum degree* to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs."  20 CFR Pt. 404, Subpt. P, App. 2 § 200.00(c) (emphasis added). With regard to the evaluation of physical abilities in determining a claimant's RFC, the Regulations state:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis.  A limited ability to perform certain physical

> demands of work activity, such as sitting, standing, walking,
> lifting, carrying, pushing, pulling, or other physical functions
> (including manipulative or postural functions, such as reaching,
> handling, stooping or crouching), may reduce your ability to do
> past work and other work.

20 CFR § 404.1545(b).

A claimant's severe impairment does not necessarily affect his or her functional capacity for work activity. *See Griffeth*, 217 F. App'x at 429 ("A claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other.") (*quoting Yang v. Comm'r of Soc. Sec.*, No. 00-10446-BC, 2004 WL 1765480, at *5 (E.D. Mich. July 14, 2004)). In determining a claimant's RFC, the ALJ considers the total limiting effects of all medically determinable impairments, both severe and non-severe. 20 CFR § 404.1545(e); *see also White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009) ("Once one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe."). The ALJ considers all relevant medical and other evidence, including statements by medical sources regarding claimant's abilities and statements by the claimant describing the severity of his or her symptoms. 20 CFR § 404.1545(a)(3).

In the instant case, the ALJ included the following limitations in her RFC determination:

> Since his alleged disability onset date, the claimant could perform
> light work as defined in 20 CFR 404.1567(b) and 416.967(b)
> except for the limitations described in Exhibits 19F and 24F with
> acceptable [*sic*] of the IQ scores in Exhibit 15F.

TR 27.

Specifically regarding the limitations resulting from Plaintiff's physical impairments, the ALJ cites to Exhibit 24F, which is Dr. James Gregory's Physical RFC Assessment completed on

September 24, 2007. *Id.* (*citing* TR 541-48). In this Assessment, Dr. Gregory diagnosed

Plaintiff with a left knee disorder and status post gunshot wound (GSW) to the left arm. TR 541.

Dr. Gregory opined that Plaintiff could: (1) lift and/or carry (including upward pulling) a

maximum of 20 pounds occasionally and 10 pounds frequently; (2) stand, walk, and/or sit, for a

total of about 6 hours in an 8-hour workday; (3) frequently climb ramp/stairs, balance, stoop,

kneel, crouch, and crawl; and (4) occasionally climb ladder/rope/scaffolds. TR 542-43. Dr.

Gregory additionally opined that Plaintiff did not have any pushing and/or pulling limitations,

manipulative limitations, visual limitations, communicative limitations, or environmental

limitations. TR 542, 544-45.

With regard to the ALJ's consideration of Plaintiff's "status post gunshot wound to the

left upper extremity," the ALJ discussed Plaintiff's gunshot wound as follows:

> In February 2007, after reviewing the claimant's medical records,
> Susan Warner, M.D., a state agency medical consultant,
> diagnosed status post left knee arthroscopy and a left upper extremity (LUE)
> median nerve injury. Dr. Warner opined that, during an eight-hour
> workday, he could lift and/or carry 20 pounds occasionally and 10
> pounds frequently, could stand and/or walk for 6 hours, could sit
> for 6 hours, could frequently push and/or pull with the left upper
> extremity (LUE), and could perform frequent postural activities
> (except for occasionally climbing ladders, ropes, or scaffolds) with
> no other limitations. Exhibit 16F.

> In September 2007, after reviewing the claimant's medical records,
> James Gregory, M.D., a state agency medical consultant, diagnosed
> a left knee disorder and status post gunshot wound (GSW) to the
> left arm. Dr. Gregory concurred with Dr. Warner's opinion
> regarding the claimant's physical capabilities except he did <u>not</u>
> believe the claimant was limited in his ability to push or pull.
> Exhibit 24F.

TR 22-23 (*citing* TR 465-472, 541-48).

The ALJ, in her RFC determination, specifically accepted the limitations opined by Dr.

38

Gregory in his Physical RFC Assessment.  Based on the evidence of record, the ALJ could reasonably conclude that Plaintiff's RFC did not require additional limitations attributable to Plaintiff's "status post gunshot wound to the left upper extremity" beyond those encompassed above.  Although Plaintiff argues that the ALJ should have included the manipulative limitations opined by Dr. Warner in her RFC finding, as discussed and demonstrated in the first statement of error, the ALJ properly found that the manipulative limitations opined by Dr. Warner were inconsistent with other evidence in the record, and properly accorded more weight to Dr. Gregory's opinion than to Dr. Warner's opinion.  Accordingly, the ALJ did not err in her consideration of Plaintiff's "status post gunshot wound to the left upper extremity."

**4.  Application of the Law Pertaining to Claimants with a History of Felony Incarceration**

Plaintiff contends that the ALJ incorrectly applied the Social Security Regulations and Rulings pertaining to situations in which a claimant is incarcerated for a felony.  Docket No. 13-1 at 10.  Specifically, Plaintiff argues that the ALJ failed to consider his depression in accordance with 20 CFR §404.1506(b) and SSR 83-21.  *Id.* at 10-12.  In particular, Plaintiff argues that, as a result of her incorrect assumption that the impairment arose or worsened while he was incarcerated, the ALJ failed to properly consider his depression.  *Id.* (*citing* TR 26).  Plaintiff asserts that the ALJ misrepresented 20 CFR §404.1506(b), which states that the rule "does not preclude establishment of a period of disability based upon the impairment or aggravation."  *Id.* at 10-11.  Plaintiff therefore argues that he could be found disabled based upon his depression for the period before or after his incarceration.  *Id.* at 11.

Plaintiff additionally argues that the ALJ failed to comply with SSR 83-121, which sets forth the proper procedure for evaluating claims in which the claimant has been convicted of a

felony. *Id.* Plaintiff asserts that the Ruling requires the ALJ to consider "'all of the medical evidence, including that for any impairment which arose or was aggravated during confinement for the conviction of the felony.'" *Id.* (*quoting* SSR 83-21). Plaintiff contends that the ALJ erred by: (1) attempting to isolate or remove his depression from consideration at step two of the ALJ's sequential evaluation; and (2) failing to include the required rationale in her decision. *Id.* at 11-12.

Defendant maintains that the ALJ properly applied the law relating to claimants with a history of felony incarceration. Docket No. 15 at 22. Defendant explains that SSR 83-21 and 20 CFR § 404.1506 "provide the relevant framework for determining when an impairment will not be considered because of its association with the claimant's conviction for a felony." *Id.* Defendant clarifies that an impairment is not considered for disability purposes if it "arises or is aggravated in connection with a claimant's *commission of a felony*," but may be considered for the limited purpose of payable benefits if it "arises or is aggravated in connection with a claimant's *confinement in prison*." *Id.* at 22-23 (emphasis original). Defendant asserts that the ALJ correctly applied these rules by explaining that Plaintiff was ineligible for benefits during the period in which he was incarcerated. *Id.* at 23. (*citing* TR 25).

Defendant also argues that the ALJ specifically discussed, and therefore properly considered, evidence of Plaintiff's reported depression while incarcerated. *Id.* (*citing* TR 26). Defendant further maintains that, when viewed in context, the ALJ's conclusion that Plaintiff "'cannot be considered to have either of those impairments since February 1, 2006,'" is not an incorrect application of the law, but rather, was based on the absence of evidence showing any mental impairment after Plaintiff's release from prison. *Id.* at 23-24 (*citing* TR 25-26). Finally,

Defendant asserts that, even assuming that the ALJ incorrectly applied 20 CFR § 404.1506 or

SSR 83-21, the error does not warrant remand because, as the ALJ stated, the record contains no

evidence showing that Plaintiff continued to suffer from depression after his release from prison.

*Id.* at 24.

The ALJ discussed Plaintiff's depression while incarcerated and the medical evidence

relating thereto as follows:

> During his incarceration the claimant was treated for anxiety and
> depression. Exhibit 27F-29F.  Still, it would seem those conditions
> could be incorporated into the claimant's adjustment disorder with
> mixed anxiety and depressed mood as discussed above.  There is
> no evidence the claimant has received any treatment for any mental
> condition since his release from incarceration.
>
> . . .
>
> . . .There is evidence the claimant was diagnosed with depression
> but only after he was incarcerated.  Whatever impairments
> worsened or developed during incarceration cannot be considered
> while the claimant is incarcerated for a felony. 20 CFR
> §404.1506(b).  Hence, the claimant cannot be considered to have
> had either of those impairments since February 1, 2006.

TR 25-26 (*citing* TR 567-679).

Additionally, the ALJ discussed the effects of Plaintiff's incarceration on his disability

claim as follows:

> The claimant was incarcerated from April 3, 2008 until July 2009
> for fraudulent use of a credit card such that it was a Class E felony.
> Exhibit 11E. (See Tenn. Code Ann. §§ 39-14-103 and 39-14-
> 105(2)).  Under Tennessee law, a person commits theft of property
> if, with intent to deprive the owner of property, the person
> knowingly obtains or exercises control over the property without
> the owner's effective consent.  Thus, the claimant cannot receive
> disability insurance benefits from April 3, 2008 to July 31, 2009 or

supplemental income from May 1, 2008 to June 30, 2009. 20 CFR
404.468(a) [*sic*] and 416.211(a).

TR 25 (*citing* TR 278).

As an initial matter, Defendant correctly explains that an impairment is not considered for
disability purposes if it arises or is aggravated in connection with a claimant's commission of a
felony, but may be considered for the limited purpose of payable benefits if it arises or is
aggravated in connection with a claimant's confinement in prison. 20 CFR. § 404.1506(a)-(b);
SSR 83-21.

As can be seen, the ALJ considered and discussed Plaintiff's depression and anxiety
during incarceration. The ALJ reasonably determined that any limitations resulting from
Plaintiff's depression and anxiety were incorporated by the limitations resulting from his
"severe" adjustment disorder with mixed anxiety and depressed mood, and further noted that
there is no evidence in the record reflecting that Plaintiff has received any treatment for any
mental condition since his release from incarceration. The ALJ in the instant action properly
discussed Plaintiff's incarceration and the fact that Plaintiff had been treated for anxiety and
depression while incarcerated, but had not received any treatment for any mental condition since
his release from incarceration, for the limited purpose of determining payable benefits. After
appropriately so doing, the ALJ ultimately determined that Plaintiff could not receive payable
benefits for the period of time that he was incarcerated. This determination was proper;
Plaintiff's contentions on this point fail.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for

Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge